<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
_____

| | | |
|---|---|---|
| MARBLE SPIKES, | : | |
| | : | Civil Action No. 16-0406-BRM-DEA |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| CHOTEE, INC. d/b/a the INN AT | : | |
| MILLRACE POND | : | |
| | : | **OPINION** |
| Defendant. | : | |
| _____ | : | |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is a Partial Motion for Summary Judgment filed by Plaintiff Marble

Spike's ("Plaintiff") (ECF No. 11) and a Cross-Motion for Summary Judgment filed by Defendant

Chotee, Inc.'s, d/b/a the Inn at Millrace Pond ("Defendant") (ECF No. 19).[1] All motions are

---

[1] Plaintiff argues Defendant's Cross-Motion for Summary Judgment is untimely and should have been filed by January 13, 2017. (ECF No. 21 at 2-4.) The Court agrees. (*See* Pretrial Scheduling Order (ECF No. 7) (stating the Court will set a schedule for dispositive motions during the status conference); Pretrial Scheduling Order (ECF No. 9) (stating if the matter is not resolved, the Court would set a schedule for dispositive motions); and Judge Douglas E. Arpert's Letter Order (ECF No. 10) ("All dispositive motions must be filed by January 13, 2017.").) Pursuant to Federal Rule of Civil Procedure 6(b):

> (1) In General. When an act may or must be done within a specified
> time, the court may, for good cause, extend the time:
> (A) with or without motion or notice if the court acts, or if a
> request is made, before the original time or its extension
> expires; or
> (B) on motion made after the time has expired if the party failed
> to act because of excusable neglect.

"Courts have construed . . . construction of Rule 6(b) to impose a strict requirement that litigants file formal motions for Rule 6(b) time-extensions when attempting to file in contravention of a scheduling order." *Drippe v. Tobelinski*, 604 F.3d 778, 784 (3d Cir. 2010). "Thus a party must make a formal motion for extension of time and the district court must make a finding of excusable neglect, under [*Pioneer Inv. Servs. Co. v. Brunswick Assocs.*, 507 U.S. 380, 395 (1993)] factors,

1

opposed. (*See* ECF No. 19 and ECF No. 21.) Pursuant to Federal Rule of Civil Procedure 78(b), the Court did not hear oral argument. For the reasons set forth below and in footnote 1, both motions are **DENIED** and the matter is **REMANDED** to state court.

## I. FACTUAL BACKGROUND

In September 2014, Plaintiff was hired by Defendant as an Executive Chef. (Pl.'s Statement of Facts (ECF No. 11-2) ¶ 3 and Def.'s Response to Pl.'s Facts (ECF No. 18) ¶¶ 1-5.) Plaintiff's job responsibilities included "hiring and training kitchen staff, creating menus, 'costing out' food, 'costing out' labor, managing inventory, 'ordering and receiving' food, overseeing and assisting with meal preparation, and cleaning and maintain kitchen equipment." (ECF No. 11-2 ¶ 5 and ECF No. 18 ¶¶ 1-5.) The Executive Chef position was "a very physical one, requiring long hours standing behind a hot stove, lifting heavy items, running up and down stairs with kitchen supplies and dealing with a stressful environment." (Def.'s Statement of Facts (ECF No. 17 ¶ 12) and Pl.'s Response to Def.'s Statement of Facts (ECF No. 21-12) ¶ 12.) The most important parts of the Plaintiff's job responsibilities included: (1) being a team leader (to be able to function in a kitchen environment, to be able to produce food, to create the menu in a way that the food can be produced in timely manner so the customers are were not waiting an hour for their food, to create a team to run in the kitchen and wait tables); (2) maintaining an accurate cost; (3) generating sales; and (4) managing and scheduling staff. (Sue-Anne Hansen's Dep. Part 1 (ECF No. 11-3) at 31:1-10, 33:15-

---

before permitting an untimely motion." *Id.* at 784-85. Defendant did not file a formal motion for extension of time. Accordingly, the Court will not consider Defendant's Cross-Motion for Summary Judgment and will only consider its opposition to Plaintiff's Motion for Summary Judgment. As such, Defendant's Cross-Motion is **DENIED**. Notably, Defendant's Cross-Motion and opposition are filed jointly as one brief. (ECF No. 16.)

34:22.) Plaintiff possessed discretionary authority to reassign duties or move people around in the kitchen to run it more efficiently. (ECF No. 11-3 at 39:5-12.)

Defendant was satisfied with Plaintiff's ability to design a menu and produce food items. (ECF No. 17 ¶ 3 and ECF No. 21-12 ¶ 3.) However, the parties agree, Defendant was dissatisfied with Plaintiff's conduct toward his coworkers and with Plaintiff's performance of administrative functions, including cost containment of food ingredients and maintenance of inventory. (ECF No. 17 ¶¶ 4-5 and ECF No. 21-12 ¶¶ 4-5.)

On October 12, 2015, Plaintiff "suffered a major heart attack while at work." (ECF No. 11-2 ¶ 10 and ECF No. 18 ¶ 10.) His wife picked him up around 7:00 p.m. or 7:30 p.m. and took him to East Pocono Medical Center ("East Pocono"). (ECF No. 11-2 ¶ 11 and Hansen's Dep. Part 2 (ECF No. 11-4) at 69:8-14.) At East Pocono, Plaintiff was informed that a portion of his heart was rendered dead (he had an evacuation fraction of 15%), he would potentially need a heart transplant, and he would have to wear a life vest to resuscitate him in the event of a complete heart failure. (ECF No. 11-2 ¶ 12 and ECF No. 18 ¶ 12.)

On October 13, 2015, Plaintiff called Sue-Ann Hansen ("Hansen"), his direct supervisor (ECF No. 11-2 ¶ 4; ECF No. 18 ¶ 1-5; and ECF No. 17 ¶ 1.), informing her about the heart attack. (ECF No. 11-2 ¶ 13 and ECF No. 18 ¶ 13.) Specifically, he informed her that "he had a blockage in his heart; that a 'procedure' was going to be necessary to clear the blockage;" his potential need for a heart transplant; and his need to wear a life vest. (ECF No. 11-2 ¶¶ 14-15 and ECF No. 18 ¶¶ 14-15.) Between October 12 and 16, 2015, Plaintiff and Hansen "continued to speak regarding Plaintiff's condition and his anticipated need for medical leave." (ECF No. 11-2 ¶ 16 and ECF No. 18 ¶ 16.) On October 16, 2015, Plaintiff, against doctor's wishes, voluntarily discharged himself from the hospital. (Pl.'s Dep. (ECF No. 11-7) at 16-18.)

Defendant granted Plaintiff a leave of absence from work to permit him time to recover from his heart attack, however, no specific length of time was agreed upon for the leave. (ECF No. 11-2 ¶ 19 and ECF No. 18 ¶ 19.) As a result of his leave of absence, Defendant was required to either delegate Plaintiff's responsibilities to other qualified employees or hire another Executive Chef. (ECF No. 11-2 ¶ 20 and ECF No. 18 ¶ 20.) Initially, Plaintiff's job responsibilities were collectively assumed by Alicia Neubert ("Neubert") and Brian Noe G. Zuniga ("Zuniga"). (ECF No. 11-2 ¶ 21 and ECF No. 18 ¶ 21.) However, approximately two weeks into their collective assumption of Plaintiff's role, Hansen concluded "they would not be able to effectively sustain the role of Executive Chef" and that a sole Executive Chef was necessary. (ECF No. 11-2 ¶¶ 22-23 and ECF No. 18 ¶¶ 22-23.) In February 2016, Zuniga left employment with Defendant. (ECF No. 11-2 ¶ 24 and ECF No. 18 ¶ 24.) By default, Neubert became the Executive Chef. (ECF No. 11-2 ¶ 25 and ECF No. 18 ¶ 25.) However, Hansen felt Neubert was not qualified for the position. (ECF No. 11-2 ¶¶ 25-26 and ECF No. 18 ¶¶ 25-26.) Accordingly, in the spring of 2016, Defendant hired a replacement Executive Chef. (ECF No. 11-2 ¶ 28 and ECF No. 18 ¶ 28.) In July 2015, a permanent replacement for Plaintiff was hired. (ECF No. 11-2 ¶ 29 and ECF No. 18 ¶ 29.)

Despite this new replacement, during Plaintiff's recovery and leave of absence, Plaintiff performed limited administrative work for Defendant remotely. (ECF No. 11-2 ¶ 30; ECF No. 18 ¶ 30; *see* Email Communications (ECF Nos. 11-8, 11-9, and 11-10).) Specifically, he assisted with menu design, ordering kitchen equipment, and restocking food items. (ECF No. 11-2 ¶ 31 and ECF No. 18 ¶ 31.)

In an e-mail dated November 1, 2015, Plaintiff informed Hansen that he was starting "cardio rehab" the following day and that the doctor felt he had a "good outlook." (Pl. Nov. 1, 2015 E-Mail (ECF No. 11-11); *see* ECF No. 11-2 ¶ 34 and ECF No. 18 ¶ 34.) He further stated,

"If everything goes to plan I will be able to return the week of November 9th. I am interested to hear your thoughts, talk to you soon." (ECF No. 11-11.) However, Plaintiff and Hansen spoke on November 2, 2015, and Plaintiff memorialized that conversation in a letter dated November 3, 2015, in which he stated:

> To confirm our phone conversation on November 2, 2015 at around 11:05 a.m. it is my understanding that as of November 2, 2015, the Inn at Millrace Pond has made the decision to terminate me from my position as Executive Chef. . . . On Sunday October 29, 2015 I decided to email you to inform you that Dr. Jain was very optimistic about releasing me to come back to work the week of November 9, 2015 and that I wanted to come to the Inn to discuss what, if any, accommodations would need to be made for me to fulfill my duties as Executive Chef. Today after completing cardiac rehab I called you before heading to the Inn and it was at this point that you let me know that my position as Executive Chef at the Inn at Millrace Pond was no longer available and that there was not going to be any discussions about me returning to work. If any of these statements are incorrect please let me know via email. If I hear nothing back from you then I will trust that you agree with all that I have written. I feel it is best from this point forward that any and all communications between you (and/or any affiliates of the Inn at Millrace Pond) and I should be through email only.

(Pl.'s Nov. 3, 2015 Letter (ECF No. 11-12).) That same day, Hansen responded stating:

> Can you provide me with a full release from your Doctor. He must state that he is aware of the conditions of your Job such as excessive heat, stairs, and stress.
> This positions is a working chef's job. As I explained on the phone our food costs and labor costs in the kitchen are already contributing to operational loss. You and I have had many conversations regarding that over the year of your employ.
>
> You told me your hart [sic] is only working 25% and that a portion of your hart [sic] is dead. You also told me a hart [sic] transplant was very possibly the only full recovery for you. Currently you are required to have a life vest on 24 hours a day so if you have another hart [sic] attack this would restart your hart [sic].
>
> You also told me you checked yourself out of the Hospital with out [sic] the doctors [sic] permission. The Hospital advised you to stay.

> My council to you again and again on the phone was to take this
> time to get better.
>
> You than [sic] asked me to write a letter stating you can not [sic]
> return to work with out [sic] a complete release from you doctor so
> you can apply for Medicaid and disability.
>
> Our conversation was very difficult and left me very confused as to
> what is really going on with your health, I do not agree or confirm
> the details of your letter I do understand you would like to return to
> work but I am greatly concerned about your condition. Thank you.

(Hansen's Nov. 3, 2015 E-Mail (ECF No. 11-13).) The parties never discussed a specific set of

physical restrictions in connection with Plaintiff's desire to return to work. (ECF No. 11-2 ¶ 36;

ECF No. 18 ¶ 36; ECF No. 21-12 ¶ 13.) However, Plaintiff proposed taking a $20,000 reduction

in salary. (ECF No. 11-7 at 122:6.) Defendant admits it never made any inquiry into the specific

type of "light duty" restrictions that could have accommodated Plaintiff's condition or into the

specific nature of his medical condition or limitations associated therewith. (ECF No. 11-2 ¶¶ 37-

38 and ECF No. 18 ¶¶ 37-38.) Instead, Hansen requested Plaintiff to provide her with a full medical

release before returning to work. (ECF No. 11-2 ¶ 38 and ECF No. 18 ¶ 38.)

However, at her deposition she stated, although it would be difficult, she would accept

something less than a full medical release. (ECF No. 11-4 at 100:21.) Specifically, she testified:

> If the doctor would have said he can work in an environment that
> gets extremely hot and extremely stressful, he can be on his feet, you
> know, can he have somebody else unload and walk up and down the
> stairs for him and actually cook on the grill for a short time, possibly.
> The parameters were so – it's a working position.
>> It never was sitting behind a desk, light duty, administrative
> job. It's a very small kitchen. The revenues there are very low. It has
> to maintain that working status.
>> So if I understood what a parameter meant then maybe I
> could have made a decision. I never saw a release of any sort.

(*Id.* at 100:21-101:11.) In its interrogatory responses, Defendant confirmed:

> The nature of [P]laintiff's position was that of line chef, requiring that he spend his work time in a hot kitchen preparing food, exposed to high temperatures and climbing up and down stairs repeatedly. Defendant was not in a position to afford [P]laintiff an administrative position that would allow him to be seated in a more temperate environment as it required a person to perform the function [P]laintiff had performed. It was therefore not possible to afford [P]laintiff the accommodation he apparently required.

(Def.'s Answers to Pl.'s Interrogatories (ECF No. 11-15).)

On November 10, 2015, Jain Praveer, MD provided Plaintiff with a prescription stating "[m]ay return to work *light duty* until further notice." (Doctor's Prescription (ECF No. 11-17) (emphasis added).) Accordingly, "Plaintiff made it known to [] Hansen that he wished to return to work on some form of a light duty basis." (ECF No. 11-2 ¶ 33 and ECF No. 18 ¶ 33.) Defendant contends "light duty" was never described. (ECF No. 18 ¶ 33.) Although Defendant concedes Plaintiff stopped performing any services relating to his employment sometime in October 2015, the parties disagree as to whether Plaintiff resigned or was terminated. (ECF No. 11-2 ¶ 48-50; ECF No. 18 ¶ 48-50; *see* ECF No. 11-4 at 106-113.)

## II.    PROCEDURAL HISTORY

On January 22, 2016, Plaintiff filed a Complaint alleging Defendant: (1) violated the New Jersey Law Against Discrimination (NJLAD) by failing to provide Plaintiff with a reasonable accommodation for a qualifying disability and/or by terminating plaintiff in retaliation for requesting a reasonable accommodation; and (2) interfered with his right to protected medical leave under the Family and Medical Leave Act ("FMLA"). (ECF No. 1 at 5-9.) On January 13, 2017, Plaintiff filed a Partial Motion for Summary Judgment as to the NJLAD failure to accommodate claim. (ECF No. 11.) On January 24, 2017, Plaintiff filed a stipulation of dismissal

as to Count I of Plaintiff's Complaint, the FMLA claim. (ECF No. 12.)[2] On February 3, 2017, Defendant filed a Cross-Motion for Summary Judgment and opposition as to the NJLAD failure to accommodate claim. (ECF No. 19.) All motions are opposed. Having already denied Defendant's Cross-Motion for Summary Judgment, *see* n.1 *supra*, the only motion remaining before this Court is Plaintiff's Partial Motion for Summary Judgment.

## III.  LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*,

---

[2] The Court had jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. (*See* ECF No. 1.) Although there are no longer any federal claims before the Court, since the motions were fully briefed, the Court exercises its right to retain supplemental jurisdiction over the NJLAD claim, pursuant to 28 U.S.C. § 1367 for the purposes of these motions. *Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 444 (3d Cir. 1997) (noting that the decision to decline to exercise supplemental jurisdiction over a plaintiff's remaining state law claims "is committed to the sound discretion of the district court").

477 U.S. at 255)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Id.* at 331. On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders

all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

## IV. DECISION

### A. NJLAD (Count II)

The NJLAD prohibits "any unlawful discrimination against any person because such person is or has been at any time disabled or any unlawful employment practice against such person, unless the nature and extent of the disability reasonably precludes the performance of the particular employment." N.J.S.A. § 10:5–4.1. The "purpose of the [NJ]LAD is to secure to [disabled] individuals full and equal access to society, bounded only by the actual physical limits that they cannot surmount." *Tynan v. Vicinage 13 of Superior Court*, 351 N.J. Super. 385, 398 (App. Div. 2002) (citation omitted).

A plaintiff bears the burden of establishing a *prima facie* case of discrimination. *Grigoletti v. Ortho Pharm. Corp.*, 118 N.J. 89, 97 (1990) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The elements of an NJLAD claim vary based on the cause of action alleged. *Victor v. State*, 203 N.J. 383, 408 (2010). "There is no single prima facie case that applies to all employment discrimination claims. Instead, the elements of the prima facie case vary depending upon the particular cause of action." *Id.*

"The failure to accommodate is one of two distinct categories of disability discrimination claims. . . ." *Tynan*, 351 N.J. Super. at 397. The requirements for a failure to accommodate claim under the NJLAD have been interpreted in accordance with its federal counterpart, the Americans with Disabilities Act ("ADA"). *Tynan*, 351 N.J. Super. at 397; *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 246 n.12 (3d Cir. 2006). To establish a *prima facie* case of failure to accommodate, a plaintiff must first prove the following common factors:

> (1) plaintiff was handicapped or disabled within the meaning of the
> statue; (2) plaintiff was qualified to perform the essential functions
> of the position of employment, with or without accommodation; (3)
> plaintiff suffered an adverse employment action because of the
> handicap or disability; and (4) the employer sought another to
> perform the same work after plaintiff had been removed from the
> position.

*McQuillan v. Petco Animal Supplies Stores, Inc.*, No. 13-5773, 2014 WL 1669962, at *6 (D.N.J.

Apr. 28, 2014); *Armstrong,* 438 F.3d at 246; *see Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296,

317–320 (3d Cir. 1999); *Linton v. L'Oreal USA*, No. 06-5080, 2009 WL 838766, at *3 (D.N.J.

Mar. 27, 2009); *Tynan,* 351 N.J. Super. at 400.

"If there is a claim that the employer failed to engage in an interactive process concerning

accommodation, that argument goes to the second factor of the prima facie case." *Linton*, 2009

WL 838766, at *3. In order to plead that an employer failed to participate in the interactive process,

a disabled employee must prove the following additional factors:

> (1) the employer knew about the employee's disability; (2) the
> employee requested accommodations or assistance for his disability;
> (3) the employer did not make a good faith effort to assist the
> employee in seeking accommodations; and (4) the employee could
> have been reasonably accommodated but for the employer's lack of
> good faith.

*McQuillan*, 2014 WL 1669962, at *6 (quoting *Tynan*, 351 N.J. Super. at 400-01).

"Under the [NJ]LAD, an employer must reasonably accommodate an employee's

disability and the related limitations of an employee, 'unless the employer can demonstrate that

the accommodation would impose and undue hardship on the operation of its business.'"

*Hennessey v. Winslow Twp.*, 368 N.J. Super. 443, 452 (App. Div. 2004) (quoting *Tynan*, 351 N.J.

Super. at 397), *aff'd*, 183 N.J. 593 (2005); *see also* N.J.A.C. 13:13–2.5(b). Although, an employer

must reasonably accommodate an employee with a disability, that duty "extends only so far as

necessary to allow a disabled employee to perform the essential functions of his job. It does not

require acquiescence to the employee's every demand." *Tynan*, 351 N.J. Super. at 397 (citations omitted). Indeed, if the "employer reasonably determines that an employee because of handicap cannot presently perform the job even with an accommodation, then the employer need not attempt reasonable accommodation." *Id.*

Requests for reasonable accommodations need not be in writing or use the phrase "reasonable accommodation." *Tynan*, 351 N.J. Super. at 399 (citing *Taylor*, 184 F.3d at 313). "[A]n employer cannot expect an employee to read its mind and know that he or she must specifically say 'I want reasonable accommodation.'" *Id.* (quoting *Taylor*, 184 F.3d at 313). "While there are no magic words to seek an accommodation, the employee, however, 'must make clear that . . . assistance [is desired] for his or her disability.'" *Id.* (quoting *Jones v. United Parcel Service*, 214 F.3d 402, 408 (3d Cir .2000)).

After a request is made, it is the employer's duty to initiate an informal interactive process to determine what appropriate accommodation is necessary. *Tynan*, 351 N.J. Super. at 400. "This process must identify the potential reasonable accommodations that could be adopted to overcome the employee's precise limitations resulting from the disability. Once a [disabled] employee has requested assistance, it is the employer who must make the reasonable effort to determine the appropriate accommodation." *Id.* (citations omitted). During the process, however, "both employer and employee bear responsibility for communicating with one another to identify the precise limitations resulting from the disability and potential reasonable accommodation that could overcome those limitations." *Jones v. Aluminum Shapes*, 339 N.J. Super. 412, 422 (App. Div. 2001) (citations omitted).

**B. Analysis**

Plaintiff contends no genuine issues of material fact exist with regard to his status as a disabled individual within the meaning of the NJLAD, his ability to perform the essential functions of his employment, and that he suffered an adverse employment action. (*See* ECF No. 11-1.) Defendant argues Plaintiff failed to establish: (1) he requested an accommodation; (2) he could have been reasonably accommodated; and (3) that he suffered an adverse employment action. (*See* ECF No. 16.) The Court will analyze all failure to accommodate *prima facie* elements in turn below.

### i. Failure to Accommodate

#### 1. Disabled

Here, Defendant does not dispute the first factor of Plaintiff's failure to accommodate *prima facie* case; that is, Plaintiff has established he was disabled under the NJLAD. Indeed, courts have accepted the aftermath of a heart attack as a disability within the meaning of the NJLAD. *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 404 (3d Cir. 2007) (citing *Panettieri v. C.V. Hill Refrigeration*, 159 N.J. Super. 472, 480-81 (App. Div. 1978)). Accordingly, the Court finds Plaintiff meets the first factor of the failure to accommodate *prima facie* test.

#### 2. Qualified to Perform the Essential Functions of his Employment

Per the second factor of the failure to accommodate test, whether Plaintiff was qualified to perform the essential functions of the position of his employment, with or without accommodations, the Court need only examine whether Plaintiff could perform the Executive Chef position with a reasonable accommodation. Plaintiff does not argue he could perform the job without a reasonable accommodation. (*See* ECF No. 11-1.) "[T]he second prong of the prima facie case would entail proof of either the failure to accommodate or the failure to engage in the

interactive process, but it would not extinguish the requirement that plaintiff demonstrate an adverse employment consequence." *Victor*, 203 N.J. at 411–12. Plaintiff seeks to prove this element by establishing Defendant failed to engage in the interactive process. Therefore, the Court will examine all four factors of the interactive process test in turn below.

The first factor is whether "the employer knew about the employee's disability." *McQuillan*, 2014 WL 1669962, at *6. Plaintiff claims Defendant knew about Plaintiff's disability because "Hansen explicitly testified at her deposition that Plaintiff told her of the heart attack, that he was in the hospital, that a heart transplant might be necessary, and that he would have to wear a life vest to resuscitate him in the event of complete heart failure." (ECF No. 11-1 at 6.) Defendant does not dispute this element. (*See* ECF No. 16.) Indeed, Defendant admits that on October 13, 2015, Plaintiff called Hansen and informed her about the heart attack (ECF No. 11-2 ¶ 13 and ECF No. 18 ¶ 13), that "he had a blockage in his heart and that a 'procedure' was going to be necessary to clear the blockage;" of his potential need for a heart transplant; and his need to wear a life vest (ECF No. 11-2 ¶¶ 14-15 and ECF No. 18 ¶¶ 14-15). Accordingly, the Court finds Plaintiff meets the first factor of the interactive process test.

The second factor is whether "the employee requested accommodations or assistance for his disability." *McQuillan*, 2014 WL 1669962, at *6. Plaintiff argues he requested accommodations for his disability. (ECF No. 11-1 at 6-8; ECF No. 20 at 3-4; ECF No. 21 at 7-8.) Specifically, he claims he requested to return to work on some type of "light duty" basis and wrote a letter to Hansen memorializing his desire to return to work, and his need to discuss what, if any, accommodations would have been necessary to facilitate his return. (ECF No. 11-1 at 7.) Defendant argues that while Plaintiff indicated he wanted to return to work on some type of light duty basis, "at no time did [P]laintiff provide Hansen with any medical information as to what he

was and was not physically capable of doing in light of his cardiac condition, particularly with respect to his ability to withstand the environmental rigors that defined the bulk of his work." (ECF No. 16 at 9.) Defendant further argues the November 3, 2015 letter did not constitute a request for accommodation because it "was written to confirm his alleged firing, and likely to tee up this lawsuit. Plaintiff's use in the letter of the word 'accommodation,' after he declaring [sic] himself to have been fired, surely cannot constitute a request for one." (*Id.* at 10.)

Because no magic words or phrases are needed to make a request for an accommodation and the employee need only make clear that assistance is desired, the Court finds Plaintiff meets this prong of the interactive process test. Defendant concedes Plaintiff indicated he wished to return to work on some form of a "light duty" basis. (ECF No. 11-2 ¶ 33 and ECF No. 18 ¶ 33.) The fact Plaintiff did not define or indicate what "light duty" meant or provide Defendant with any medical information as to what he was and was not physically capable of doing is irrelevant. While "both parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith," *McQuillan*, 2014 WL 1669962, at *6, it is the employer's duty to initiate an informal interactive process to determine what appropriate accommodation is necessary. *Tynan*, 351 N.J. Super. at 400. Therefore, it was Defendant's obligation to ask Plaintiff what "light duty" meant.

Further, the November 3, 2015 letter stated:

> To confirm our phone conversation on November 2, 2015 at around 11:05 a.m. it is my understanding that as of November 2, 2015, the Inn at Millrace Pond has made the decision to terminate me from my position as Executive Chef. . . . On Sunday October 29, 2015 I decided to email you to inform you that Dr. Jain was very optimistic about releasing me to come back to work the week of November 9, 2015 and that I wanted to come to the Inn to discuss *what, if any, accommodations would need to be made for me to fulfill my duties as Executive Chef.* Today after completing cardiac rehab I called you before heading to the Inn and it was at this point that

> you let me know that my position as Executive Chef at the Inn at Millrace Pond was no longer available and that there was not going to be any discussions about me returning to work. *If any of these statements are incorrect please let me know via email.* If I hear nothing back from you then I will trust that you agree with all that I have written. I feel it is best from this point forward that any and all communications between you (and/or any affiliates of the Inn at Millrace Pond) and I should be through email only.

(ECF No. 11-12.) This is also a request for accommodations, and it is apparent from Hansen's response that she construed it as such. Hansen responded by asking Plaintiff to "provide me with a full release from your Doctor. He must state that he is aware of the conditions of your Job such as excessive heat, stairs, and stress." (ECF No. 11-13.) Defendant's argument that the letter did not constitute a request for accommodation because it "was written to confirm his alleged firing, and likely to tee up this lawsuit," is unpersuasive. Indeed, Defendant argues it did not terminate Plaintiff. (ECF No. 16 at 12.) Given the fact Defendant argues it did not terminate Plaintiff, it should have interpreted this letter as a request for accommodation. Accordingly, Plaintiff meets the second prong of the interactive process test.

The third factor is whether "the employer did not make a good faith effort to assist the employee in seeking accommodations." *McQuillan*, 2014 WL 1669962, at *6. Plaintiff argues Defendant did not make a good faith effort to assist him in seeking in accommodations: "In fact, Defendant did the exact opposite of that which is required by the [NJ]LAD, namely refusing to allow Plaintiff to return to work with anything less than a full medical release." (ECF No. 11-1 at 10.) Plaintiff further argues "Hansen made no effort to understand what specific limitations were associated with Plaintiff's condition, what type of assignments would have allowed him to return, and perhaps most disturbingly, what the medical realities of Plaintiff's conditions were." (*Id.* at 11.) Defendant's argument for this factor is intertwined with its argument that Plaintiff did not request accommodations. Defendant contends it was not its responsibility "to ferret out what

[P]laintiff's medically imposed limitations were, and meeting the employee 'halfway' surely does not mean that it is." (ECF No. 16 at 10.) Defendant posits "[a]n employer can hardly refuse to provide an accommodation about which it is never informed." (*Id.*)

Defendant admits it never made any inquiry into the specific type of "light duty" restrictions that could have accommodated Plaintiff's condition or into the specific nature of his medical condition or limitations associated therewith. (ECF No. 11-2 ¶ 37-38 and ECF No. 18 ¶ 37-38.) Because the Court finds Plaintiff made a request for accommodations and Defendant admits it never made any inquiry into Plaintiff's request, Plaintiff has also established factor three of the interactive process test.

The fourth factor is whether "the employee could have been reasonably accommodated but for the employer's lack of good faith." *McQuillan*, 2014 WL 1669962, at *6. Plaintiff argues he could have been reasonably accommodated but for Defendant's lack of good faith. (ECF No. 11-1 at 13-15.) Specifically, Plaintiff contends he could have delegated the more rigorous manual labor tasks associated with his position to other staff members, focused on the administrative side of his job (as he did while he was on leave), and that Defendant could have parsed out the functions of the Executive Chef among multiple people. (*Id.* at 13-15.) Plaintiff argues the essential functions of his job were the administrative tasks of maintaining an accurate food cost, generating sales, and properly managing and scheduling kitchen staff. (*Id.* at 13.) He maintains "maintaining a full-time physical presence in Defendant's kitchen among 'excessive heat, stair climbing, and stress' and performing manual labor tasks were *not identified* by [] Hansen as the most import aspects of Plaintiff's position." (*Id.*)

Defendant claims "[i]t is undisputed that the environment which defined [P]laintiff's job is hot, and the tasks required of him were physical; the few non-physical aspects of [P]laintiff's

job were ones that Hansen maintains he performed poorly, or did not perform at all." (ECF No. 16 at 10.) Defendant argues Plaintiff performed very limited tasks while on leave, such as phone calls and assisting with a couple of menus and also contends Plaintiff did not perform any of the costing and inventory work. (*Id.* at 11.)

Based on the foregoing, the Court finds there is a genuine issue of material fact as to whether Plaintiff could have been reasonably accommodated. Hansen's deposition reveals the essential functions of an Executive Chef include: (1) being a team leader (to be able to function in a kitchen environment, to be able to produce food, to create the menu in a way that the food can be produced in timely manner so the customers are not were waiting an hour for their food, to create a team to run in the kitchen and wait tables); (2) maintaining an accurate cost; (3) generating sales; and (4) managing and scheduling staff. (ECF No. 11-3 at 31:1-10, 33:15-34:22.) Therefore, there is an issue of fact as to whether Plaintiff would need to maintain a full-time physical presence in Defendant's kitchen, with excessive heat, at the very least, in order to produce food and manage his kitchen staff. Even if Plaintiff was not required to maintain a full-time physical presence in Defendant's kitchen, an issue of fact remains as to what Plaintiff was permitted since "light duty" was never defined.

Further, although Plaintiff performed limited administrative work for Defendant during his leave of absence, (ECF No. 11-2 ¶ 30; ECF No. 18 ¶ 30; *see* ECF Nos. 11-8 through 11-10), he did not maintain accurate costs or generate sales. He merely assisted with menu design, ordering kitchen equipment, and restocking food items. (ECF No. 11-2 ¶ 31 and ECF No. 18 ¶ 31.) Only one task, creating menus, is listed as an essential function of the job.

In addition, there is a genuine issue of fact as to whether Defendant could perform solely administrative duties and delegate manual labor. While, Hansen admitted Plaintiff possessed

discretionary authority to reassign duties or move people around *in the kitchen* to run it more efficiently, (ECF No. 11-3 at 39:5-12), the question remains as to whether Plaintiff would need to be physically present in the kitchen to know what duties needed to be reassigned or staff needed to be moved. Moreover, while Defendant was satisfied with Plaintiff's ability to design a menu and produce food items (ECF No. 17 ¶ 3 and ECF No. 21-12 ¶ 3), it was dissatisfied with his performance of administrative functions, including cost containment of food ingredients and maintenance of inventory. (ECF No. 17 ¶¶ 4 and ECF No. 21-12 ¶¶ 4.)

Lastly, Plaintiff suggests Defendant could have parsed out Plaintiff's Executive Chef duties among multiple individuals to reduce his obligations. (ECF No. 11-1 at 14.) The Court finds this argument unpersuasive. Initially, Plaintiff's job responsibilities were collectively assumed by Neubert and Zuniga (ECF No. 11-2 ¶ 21 and ECF No. 18 ¶ 21.) However, approximately two weeks into their collective assumption of Plaintiff's role, Hansen concluded "they would not be able to effectively sustain the role of Executive Chef" and a sole Executive Chef was necessary. (ECF No. 11-2 ¶¶ 22-23 and ECF No. 18 ¶¶ 22-23.) The record demonstrates Defendant attempted this alternative and it did not work. Therefore, the Court finds there is a genuine issue of material fact as to factor four of the interactive process test. For that reason, there is also an issue of fact as to whether Plaintiff was qualified to perform the essential functions of his employment even with reasonable accommodations.

### 3. Adverse Employment Action

Defendant claims Plaintiff cannot prove he suffered an adverse employment action. (ECF No. 16 at 12.) Specifically, it argues "Hansen maintains unequivocally that she did not tell [P]laintiff that he was fired, but only that he would be required to provide documentation from his medical provider to the effect that he was fit for work." (*Id.* at 13.) Defendant further argues "[t]he

record is thus quite plain that as of November 3, 2015, [P]laintiff had suffered no adverse employment action, and he chose to communicate no further with [Defendant] after that date." (*Id.*) Plaintiff contends he suffered an adverse employment action, separation from employment, which resulted from Defendant's insistence on a full medical release. (ECF No. 11-1 at 16.)

While there are no bright-line rules defining an adverse employment consequence, New Jersey courts have looked to federal law to determine what constitutes an adverse employment decision in the context of an NJLAD claim. *Mancini v. Twp. of Teaneck*, 349 N.J. Super. 527, 564 (App. Div.), *certif. granted and remanded*, 174 N.J. 359 (2002). The factors to be considered include an "employee's loss of status, a clouding of job responsibilities, diminution in authority, disadvantageous transfers or assignments, and toleration of harassment by other employees." *Id.* "In order to constitute 'adverse employment action' for the purposes of the [NJ]LAD, retaliatory conduct must affect adversely the terms, conditions, or privileges of the plaintiff's employment or limit, segregate or classify the plaintiff in a way which would tend to deprive her of employment opportunities or otherwise affect her status as an employee." *Marrero v. Camden Cty. Bd. of Soc. Servs.*, 164 F. Supp. 2d 455, 473 (D.N.J. 2001) (citations omitted). However, "an employer's adverse employment action must rise above something that makes an employee unhappy, resentful or otherwise cause an incidental workplace dissatisfaction." *Victor*, 401 N.J. Super. at 616. "Clearly, actions that affect wages, benefits, or result in direct economic harm qualify. So too, noneconomic actions that cause a significant, non-temporary adverse change in employment status or the terms and conditions of employment would suffice." *Id.*

The Court finds there is a genuine issue of material fact as to whether or not Plaintiff suffered an adverse employment action. First, Plaintiff admits there is an issue of fact as to whether or not he was terminated. (ECF No. 21 at 4 ("In other words, Defendant essentially takes the

position that because Defendant claims that Plaintiff was not terminated, *a fact which is disputed to begin with*, Plaintiff cannot conceivably prove the necessary element of his claim that he suffered an adverse employment action, thus entitling Defendant to Summary Judgment.") (emphasis added) (citation omitted).) Indeed, Hansen admitted she no longer considers Plaintiff to be an employee of Defendant, however, alleges she never terminated him. (*See* ECF No. 11-4 at 106:9-108:18). Instead, Hansen states the separation occurred because she requested Plaintiff provide the "release from his doctor and it was never supplied." (*Id.* at 108:2-4.) While Plaintiff is no longer considered an employee of Defendant, there is an issue of fact as to whether he suffered an adverse employment action or voluntarily chose to stop communicating with Defendant to return to work. Plaintiff's separation from employment alone cannot be an adverse employment action because the "separation" was granted as a temporary leave of absence to recover from his heart attack. (ECF No. 11-2 ¶ 19 and ECF No. 18 ¶ 19.) Accordingly, the Court finds there is an issue of fact as to whether or not Plaintiff suffered an adverse employment action.

### 4. Employer Sought Another to Person the Same Work

Both parties concede that in July 2015, a permanent replacement for Plaintiff was hired. (ECF No. 11-2 ¶ 29 and ECF No. 18 ¶ 29.) Accordingly, this factor is met.

Because the Court finds there is a genuine issue of material fact as to whether Plaintiff was qualified to perform the essential functions of his employment and suffered an adverse employment action, the Court **DENIES** Plaintiff's Motion for Summary Judgment as to the NJLAD failure to accommodate claim.[3]

---

[3] New Jersey courts have suggested that it may be possible to successfully assert failure to accommodate as a separate claim without a *prima facie* showing of disability discrimination. *See Victor*, 203 N.J. at 422; *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 849 n.31 (3d Cir. 2016). "This would allow plaintiffs who have not experienced an adverse employment action such as termination, to nevertheless assert a failure to accommodate claim." *Tourtellotte*, 636 F. App'x at

## V.    CONCLUSION

For the reasons set forth above, the Court **DENIES** both Plaintiff and Defendant's motions for summary judgment. However, the Court declines to further exercise supplemental jurisdiction over the remaining state law claims. *See* 28 U.S.C. § 1367(c)(3); *Queen City Pizza*, 124 F.3d at 444 (the decision to decline to exercise supplemental jurisdiction over a plaintiff's remaining state law claims "is committed to the sound discretion of the district court"); *Bonilla v. New Jersey*, No. 15-6795, 2017 WL 3086226, at *3, 12 (D.N.J. July 20, 2017) (retaining supplemental jurisdiction over the state law claims for purposes of the summary judgment motion, but remanding the matter to state court for trial) Accordingly, this matter is **REMANDED** to state court. An appropriate order will follow.


Date: August 24, 2017                                  */s/ Brian R. Martinotti*_____
                                                                  **HON. BRIAN R. MARTINOTTI**
                                                                  **UNITED STATES DISTRICT JUDGE**

---

849 n.31. However, neither the New Jersey Supreme Court nor the Third Circuit has decided the issue. *Id.* Since the Court also found there are genuine issues of material fact for reasons separate from whether or not Plaintiff suffered an adverse employment action, such as whether Plaintiff could have been reasonably accommodated, it need not determine if failure to accommodate can proceed as a separate action.